**STATE OF MINNESOTA**                           **DISTRICT COURT**

**COUNTY OF HENNEPIN**                    **FOURTH JUDICIAL DISTRICT**

---

Michael Janish,                                        Case Type: Employment
                                                             Court File No.: _____
        Plaintiff,                               The Honorable _____

    v.                                                    **SUMMONS**

Metropolitan Council; and Joan
Hollick (in her individual capacity),

        Defendants.

---

**To: Metropolitan Council and Joan Hollick.**

1.    **You are being sued**. The Plaintiff has started a lawsuit against you. The *Complaint* is attached to this *Summons*. Do not throw these papers away. They are official papers that start a lawsuit and affect your legal rights, even if nothing has been filed with the court and even if there is no court file number on this *Summons*.

2.    **You must reply in writing within 21 days to protect your rights.** Your reply is called an *Answer*. Getting your reply to the Plaintiff is called *service*. You must serve a copy of your *Answer* within 21 days from the date you received the *Summons* and *Complaint*. For more information on serving your *Answer*, *see* Section 4 below.

    ➢ **ANSWER**: You can find the *Answer* form and instructions on the MN Judicial Branch website at www.mncourts.gov/forms under the "Civil" category. The instructions will explain in detail how to fill out the *Answer* form.

3.    **You must respond to each claim.** The *Answer* is your written response to the Plaintiff's *Complaint*. You must state whether you admit or deny each fact alleged in the *Complaint*. If you think the Plaintiff should not be given everything they asked for in the *Complaint*, you must say so in your *Answer*.

4.    **SERVICE: You may lose your case if you do not serve a written response on the Plaintiff.** If you do not serve a written *Answer* within 21 days, default judgment may be rendered against you for the relief requested in the *Complaint*. If you agree with the

1

claims stated in the *Complaint*, you do not need to respond. Default judgment can then be entered against you for the relief requested in the *Complaint*. To protect your rights, you must serve a copy of your *Answer* on the person who signed this *Summons* in person or by mail at the address below.

Stephen M. Premo
Matthew A. Frank
Premo Frank PLLC
300 Union Plaza
333 Washington Avenue North
Minneapolis, MN 55401

5.      **Next steps.** Carefully read the Instructions (CIV301) for the *Answer* regarding next steps.

6.      **Legal Assistance.** You may wish to get legal help from an attorney. If you do not have an attorney and would like legal help, you can visit www.mncourts.gov/selfhelp and click on the "Legal Advice Clinics" tab to get more information about legal clinics in each Minnesota county. In addition, your Court Administration may have information about places where you can get legal assistance.

➢ **NOTE:** Even if you cannot get legal help, you must still serve a written *Answer* to protect your rights or you may lose the case by default judgment.

7.      **Alternative Dispute Resolution (ADR).** The parties may agree, or be ordered, to participate in an ADR process under Rule 114 of the Minnesota General Rules of Practice. You must still serve your written *Answer,* even if you expect to use ADR.

**PREMO FRANK**

Date: November 9, 2023

*s/Stephen M. Premo*
Stephen M. Premo (MN# 0393346)
stephen@premofrank.com
Matthew Alan Frank (MN# 0395362)
matt@premofrank.com
300 Union Plaza
333 Washington Avenue North
Minneapolis, MN 55401
Tel: (612) 445-7049

| | |
|---|---|
| **STATE OF MINNESOTA** | **DISTRICT COURT** |
| **COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT** |

Michael Janish,

        Plaintiff,

    v.

Metropolitan Council; and Joan
Hollick (in her individual capacity),

        Defendants.

Case Type: Employment
Court File No.: _____
The Honorable _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

The Southwest Light Rail Transit Project (SWLRT) is the largest federally funded public works project in Minnesota history. Estimated to cost $2.003 billion at its inception, the SWLRT is now projected to cost taxpayers *at least* $2.75 billion and faces a funding shortfall in the hundreds of millions of dollars. Plaintiff Michael Janish designed the project controls for the SWLRT.

The project controls were intended to prevent government waste, fraud, and abuse. But to the detriment of taxpayers, when Janish insisted on following project controls and started reporting unlawful activity to supervisors at Met Council, they decided to line the pockets of their civil contractor instead. Instead of seeking to comply with the law, Met Council sought to ostracize Janish and conceal his concerns.

With no apparent recourse at Met Council, Janish went to law enforcement in September 2020. By the following summer, Met Council had heard that the FTA's Office

1

of Inspector General (OIG) and the State of Minnesota's Legislative Auditor were conducting separate probes of the SWLRT. Feeling the heat of government oversight, Met Council began taking action against Janish.

First, Met Council attempted to make Janish approve unlawful change orders. When Janish refused, Met Council began laying the groundwork for his ouster as a "poor-performing" employee. Then, when Janish recognized, reported, and opposed the retaliation, Met Council was faced with a dilemma: (1) face the risk of exposure in employment litigation after terminating Janish; or (2) face the risk of exposure by permitting a high-level, knowledgeable, and steadfast whistleblower to remain in his position in the midst of government investigations.

Met Council chose a third path: first, publicly promote a false narrative regarding the SWLRT's ballooning costs and delays; and, second, take actions designed to get Janish to quit (e.g., by pressuring him to become complicit in unlawful conduct; overloading him with work; subjecting him to tight deadlines; removing him from his position on the SWLRT; indefinitely demoting him to a non-position involving assorted trivial tasks; stripping him of his title, access to documents, direct reports, and meaningful responsibilities; ostracizing him from colleagues; and ultimately excluding him from the SWLRT entirely).

## PARTIES

1.     Plaintiff Michael Janish is an adult individual domiciled in Hennepin County, Minnesota.

2

2.      Defendant Met Council is a public corporation and political subdivision of the State of Minnesota. According to its website: "The Metropolitan Council is the regional policy-making body, planning agency, and provider of essential services in the seven-county Twin Cities metro area."

3.      On information and belief, Defendant Joan Hollick is an adult individual domiciled in Hennepin County, Minnesota. Ms. Hollick is the Deputy Project Director of the SWLRT.

## JURISDICTION AND VENUE

4.      This Court has personal jurisdiction over Defendants because they are domiciled in Minnesota, transact business in Minnesota, and/or committed acts in Minnesota that gave rise to the claims in this Complaint.

5.      This Court has original subject-matter jurisdiction over Janish's claims. Minn. Stat. § 484.01.

6.      Venue is proper in this Court because one or more of the Defendants reside in Hennepin County, and, separately, because the claims arose in whole or in part in Hennepin County. Minn. Stat. § 542.09.

## FACTS

**Plaintiff Michael Janish.**

7.      Janish is an experienced, skilled, and licensed engineer. He has a Bachelor of Science in Civil Engineering from the University of Minnesota. He has been certified through the Army Corps of Engineers in Construction Quality Management (CQM). And

3

he has received formal training on the Project Management Institute's Project Management Body of Knowledge (PMBOK).

8. Janish has a detailed understanding of contract administration, project management, and coordination of work in the field. He has more than 20 years of experience in both the private and public sectors, and he has worked on numerous high-profile public-works projects in the Twin Cities.

9. Between 2001 and 2010, these projects included the Minneapolis Central Library, Target Field, and Hiawatha Light Rail Transit's Lindbergh Tunnel and Station.

10. Between 2010 and 2022, Janish worked at Met Council on large light-rail-transit ("LRT") projects. Throughout his employment at Met Council, Janish has consistently received positive performance reviews.

11. From 2010 to 2012, Janish worked in the field as a construction inspector on the Central Corridor LRT project. During this time, he:

    a. Performed contractor audits to verify compliance with contract documents;

    b. Co-authored checklists for documenting inspections;

    c. Trained colleagues on inspection documentation procedures;

    d. Reviewed pay applications;

    e. Generated cost estimates;

    f. Oversaw inspections for source, plant, receiving, material, installation, and final acceptance;

    g. Performed quality control checks; and

    h. Prepared nonconformance reports.

4

12.     From 2012 to 2014, Janish worked as engineer on the Central Corridor LRT project. During this time, he:

    a.  Evaluated and managed approval of contractor deliverables, submittals, work plans, and work procedures;

    b.  Reviewed sales tax reimbursement requests, certified payroll, and pay applications;

    c.  Performed quality assurance oversight per FTA guidelines;

    d.  Audited contractor QC/QA programs for compliance with contract documents;

    e.  Monitored integration testing, contractor training, and delivery of O&M manuals;

    f.  Completed the safety certification process required by the FTA prior to revenue service;

    g.  Generated cost estimates and negotiated change orders;

    h.  Trained, directed, and provided guidance to a team of field inspectors and seasonal interns; and

    i.  Conducted pre-activity meetings for new scopes of work.

13.     From 2014 to 2015, Janish worked as principal contract administrator on several Metro Transit construction projects. During this time, he:

    a.  Managed several concurrent Metro Transit construction projects;

5

b. Evaluated and managed approval of contractor deliverables, submittals, work plans, and work procedures;

c. Ensured compliance with plans and specifications;

d. Performed construction reviews on contract documents;

e. Conducted pre-bid, pre-construction, and construction progress meetings;

f. Generated cost estimates, Serialized Record Memos (SRMs), and negotiated change orders;

g. Reviewed certified payroll and pay applications; and

h. Coordinated work between contractors and Met Council.

14. From 2015 to 2022, Janish worked as the Project Controls Manager on the SWLRT. During this time, among other things, he:

a. Directed and monitored work of Project Controls staff and consultants, including cost and schedule development/analysis;

b. Oversaw development, implementation, and maintenance of multiple program level management plans, procedures, and guidelines to address complex technical, management, contractual, and policy requirements;

c. Developed management control methods to identify, analyze, and assess the effectiveness of plans and procedures;

d. Worked with stakeholders to identify and resolve project issues (e.g., FTA, Hennepin County, MnDOT, Corridor Cities, etc.);

    e.  Worked with Met Council's procurement department, project managers, outside consultants, agency staff, and other project partners;

    f.  Administered procurement procedures for special contracts and new forms of contracts, as well as construction architectural/engineering and other professional/technical service contracts;

    g.  Managed document capture and retention as required by applicable laws, policies, and procedures;

    h.  Participated on the SWLRT Risk Management Committee; and

    i.  Reviewed contractor, consultant, and other project related invoices.

15.    Joan Hollick, Met Council's Deputy Project Director of SWLRT, identified Janish as Met Council's "subject matter expert for FTA compliance."

**The Southwest Light Rail Transit Project.**

16.    The SWLRT is a planned 14.5-mile extension of light-rail service from Eden Prairie to Minneapolis. Other cities on the route include Minnetonka, Hopkins, and St. Louis Park.

17.    The SWLRT is reported to be the largest federally funded public-works project in Minnesota history and the largest taxpayer-funded transit project in the Midwest.

18.    The federal government has committed upwards of $1 billion in taxpayer funds to the SWLRT; Hennepin County and its Regional Rail Authority have committed approximately $1 billion in taxpayer funds; the Counties Transit Improvement Board, prior to dissolving in 2017, committed approximately $219 million in taxpayer funds; and

7

the State of Minnesota has committed approximately $30 million in taxpayer funds to the Project.

19.     Construction on the SWLRT began around early 2019.

**Met Council Applies for a Full Funding Grant Agreement with the FTA under its New Starts Capital Investments Program.**

20.     The Federal Transit Administration (FTA) is an agency within the Department of Transportation whose mission is to provide financial and technical assistance to local public transportation systems.[1] Pursuant to the Intermodal Surface Transportation Act of 1991 ("ISTA"), Congress authorized the FTA to enter into Full Funding Agreements with state and local transit agencies as part of the FTA's New Starts Capital Investments Grant Program.

21.     The New Starts Capital Investments Grant Program is a competitive grant program that provides federal funding for state and local transit capital investments, including heavy rail, commuter rail, light rail, streetcars, and bus rapid transit.

22.     Full Funding Grant Agreements are the designated means for providing funds for new starts projects with federal funding of $25 million or more.

23.     Under the ISTA, Full Funding Grant Agreements establish the terms and conditions for federal financial participation in a new-starts project; define the projects; and facilitate efficient management of the projects in accordance with federal statutes,

---

[1] *See generally* https://www.transit.dot.gov/about-fta (last accessed on November 8, 2023).

8

regulations, guidance, and policies. Compliance with these federal requirements is a condition of receiving the grant.

24.     The FTA enters into a Full Funding Grant Agreement for a project only when—after reviewing each application—there are no outstanding issues that would have a material effect on the estimated costs of the project or the local financial commitment to complete the project.

25.     The government relies upon explanatory, supporting, and supplementary documents submitted to it when determining whether to award a Full Funding Grant Agreement.

26.     There are two types of "explanatory, supporting, or supplementary documents" referenced in the definition of an "application": (1) those prepared during preliminary engineering and final design in anticipation of a Full Funding Grant Agreement; and (2) those that ultimately become attachments to the text of a Full Funding Grant Agreement.

27.     The first type of documents include environmental and historic preservation studies supporting the project; the applicant's project management plan; quality control and quality assurance plans; safety and security management plans; fleet management plans (both rail and bus); and financing plans for capital, operating, and maintenance costs.

28.     The second type of documents include the applicant's narrative explanation of the scope of the project; the applicant's project description; a baseline cost estimate; budget; a baseline schedule; and any environmental mitigation commitments.

9

29.    On or around August 30, 2019, Met Council submitted its application for a Full Funding Grant Agreement with the FTA (the "Application").

30.    In its Application, Met Council stated that the Project's Baseline Cost Estimate[2] was $2.003 billion, which the government accepted upon granting the Full Funding Grant Agreement.

31.    Met Council derived its Baseline Cost Estimate from the cost estimates of the individual third party contracts.

32.    In connection with its Application, Met Council stated that the Project would start and be completed within the scheduled time-frame submitted in Met Council's Application.

33.    In early 2020, while Met Council's Application was pending, Met Council and its civil contractor were in on-going talks about a construction schedule for the Project, which they referred to as a full baseline schedule. This schedule is supposed to provide a more granular account of Project activities and costs so that Met Council (and the federal government) can evaluate contractors' compliance with the Civil Construction Contract's critical milestones and effectively manage the Project.

**Met Council Fails to Follow the Law in its Stewardship of Taxpayer Dollars on the SWLRT.**

34.    Met Council employees, including Janish, took issue with the civil contractor's proposed schedule because it contradicted the Civil Construction Contract's

---

[2] The Baseline Cost Estimate is a calculation of the costs of the Project necessary to complete the scope of work under the Full Funding Grant Agreement and eligible for Federal assistance.

10

critical milestones and Met Council's representations to the government in its Application.

35.   But Met Council leaders–including Hollick, Jim Alexander, Met Council's SWLRT Project Director, and Brian Runzel, Met Council's Director of Construction– emphasized to employees that they did not want to push for compliance with the Civil Construction Contract.

36.   While it was not customary at Met Council for senior leaders to intervene in the drafting, review, and resolution of issues in a full baseline schedule, Hollick, Alexander, and Runzel intervened and took control of the process in the case of the Project.

37.   By March 2020, hundreds, if not thousands, of problems raised by Met Council employees that affected the full baseline schedule—and the timely completion of the Project—remained unresolved.

38.   Ultimately, Met Council leaders ended the process without a full baseline schedule that complied with the Civil Construction Contract.

39.   Met Council did not disclose to its government funders that it and its civil contractor never agreed upon a full baseline schedule, and, in fact, Met Council never honestly believed that it could comply with the milestones and completion dates set forth in Met Council's Application for a Full Funding Grant Agreement.

40.   As a condition of entering the Full Funding Grant Agreement for the SWLRT and receiving disbursements, Met Council certified that it would maintain

oversight to ensure that contractors performed in accordance with the terms, conditions, and specifications of their contracts.

41.     Moreover, as a condition of entering the Full Funding Grant Agreement for the Project and receiving disbursements, Met Council was required to establish and maintain effective internal control over the federal award that provides reasonable assurance that the non-federal entity is managing the award in compliance with federal statutes, regulations, and the terms and conditions of the Full Funding Grant Agreement.

42.     For example, federal law and regulations generally require Met Council to perform a cost analysis or price analysis in connection with every procurement action in excess of $250,000, including bilateral contract modifications such as the change orders at issue here. 2 C.F.R. § 200.324(a) (requiring cost analysis for every procurement action in excess of the simplified acquisition threshold); 2 C.F.R. § 200.1 (defining "simplified acquisition threshold" to mean the amount set forth in 48 C.F.R. Subpart 2.1); 48 C.F.R. § 2.101 (defining simplified acquisition threshold to be $250,000).

43.     With respect to change orders, Met Council is generally required to get an independent cost estimate, or ICE, before receiving the contractor's cost proposal. *E.g.*, 2 C.F.R. § 200.324(a); *see also* FTA C 4220.1F § 6.

44.     The requirements that Met Council perform a cost analysis and obtain an independent cost estimate before receiving the contractor's cost proposal applied to each change order at issue here.

45. An independent cost estimate is an estimate of how much the contemplated work will cost. It is a benchmark for evaluating the reasonableness of the contractor's proposed cost.

46. An independent cost estimate is critical to protect the government from overpaying for work when there is no price competition, as is the case for SWLRT change orders.

47. To fulfill its legal obligation to obtain an independent cost estimate before receiving the contractor's cost proposal, Met Council entered into a $140 million contract with design firm AECOM Technical Services, Inc. ("ATS").

48. ATS is a publicly traded billion dollar company, which describes itself as "the world's trusted infrastructure consulting firm, partnering with clients to solve the world's most complex challenges and build legacies for generations to come."

49. On February 1, 2023, Fortune Magazine rated ATS as the world's "Most Admired Company" in its industry for the third year in a row.

50. Under its contract with Met Council, ATS was to provide *independent* cost estimates, based on value engineering principles, to ensure that its contractors' proposed change orders were fair, reasonable, and cost-effective.

51. More precisely, ATS was supposed to determine the most efficient method of completing proposed changes, i.e., independent of what might be in the contractor's proposal.

52. On the SWLRT, ATS engaged in extensive research and analysis to arrive at its cost estimates. For example:

13

a. To calculate its estimate for labor costs, ATS used RS Means, an industry-standard, comprehensive reference guide for developing construction estimates.

b. ATS then estimated the wages and time required to perform the work based on the crew makeup (i.e., the skill sets and crew size needed to perform the work), adjusted to the local market and prevailing wages.

c. To calculate its estimate for equipment costs, ATS referred to the Rental Rate Bluebook, an industry-standard, comprehensive reference guide for construction equipment costs.

d. For total materials, ATS contacted local material suppliers to obtain quotes or otherwise referred to current material costs online.

In addition, ATS had extensive background knowledge on the needs of SWLRT change orders because it had led the design of the Project.

53.     Met Council's Project Controls staff, led by Janish, carefully developed a change order proposal process using the Project's construction management software, eBuilder, which would protect the independence of ATS's work and help ensure compliance with federal law and regulations.

54.     Specifically, each proposed change order describing a change to the SWLRT had to be sent separately to ATS and the civil contractor:

a. Upon receipt of a request for change order proposal, ATS and the civil contractor would simultaneously perform an estimate of how much the changes would cost.

14

b. Because Met Council must perform its independent cost estimate *before* receiving the contractor's estimate, the contractor could not put its estimate into a field accessible to Met Council until ATS had completed its independent cost estimate and put its data into eBuilder.

c. Once ATS put its cost estimate into eBuilder, the civil contractor would receive a notification that it could put its cost estimate into eBuilder. By design, the contractor's estimate, along with any additional documentation, was supposed to be unavailable to Met Council until ATS had completed its independent cost estimate.

d. After receiving both the independent cost estimate and the contractor's proposal, Met Council was legally required to perform its own cost analysis to determine whether the contractor's estimate was cost-effective, fair, and reasonable.

55.   Met Council quickly learned that the civil contractor's cost estimates routinely dwarfed ATS cost estimates.

56.   But rather than use the large deltas to negotiate fair and reasonable change orders, Met Council leaders conspired to keep the government's money flowing by subverting its own project controls.

57.   First, Met Council began obtaining access to its civil contractor's proposals before seeing independent cost estimates from ATS. Then, in order to artificially close the gap between contractor proposals and ATS cost estimates, Met Council leaders permitted

employees charged with overseeing the change order proposal process to obtain "sneak peeks" into the contractor's proposals and work product outside of e-Builder.

58.     To the same end, Met Council obtained access to ATS work product and provided it to the civil contractor outside of e-Builder.

59.     For example, with respect to Change Order 57, Janish discovered "bootleg" contractor proposals comparing ATS and contractor cost estimate data (e.g., "CHG-57 Contractor Bootleg Proposal 8-9-19.pdf" side-by-side reports ("SBS") "SBS to LMJV .xlsx," "SBS to LMJV (OG_ICE).xlsx," "SBS to LMJV rev.xlsx," and "Copy of SBS to LMJV rev200717.xlsx"). These documents were located on Met Council servers, but not found in e-Builder, which suggested that Met Council and the contractor were sharing cost and pricing data outside of established project controls.

60.     After reviewing ATS work product and communicating with the civil contractor, Met Council directed ATS to "bump up their numbers" in the ATS cost estimates (e.g., by changing assumptions about the means and methods that would be used to complete the work).

61.     On or around April 8, 2020, Janish reported to Deputy Project Director Hollick that construction staff were accessing ATS work product before submission of cost estimates; sharing it with the civil contractor before it submitted its own proposal; and, then, dissembling about their conduct.

**From:** Janish, Michael <Michael.Janish@metrotransit.org>
**Sent:** Wednesday, April 8, 2020 7:23 PM
**To:** Hollick, Joan <Joan.Hollick@metrotransit.org>
**Subject:** Construction staff influencing development of ICE's

I asked a very specific question in the change control meeting about whether construction has access to the CHG-90 ICE values while ADC is still developing the ICE. My concern has been, and still remains, that the construction staff are influencing the development of cost estimates being made and removing the independence of the estimators. Adam's response to my question was that they had not seen any dollar values from the ICE being developed and Sarah seconded that statement. **What they said is not true.**

62. Efforts by Met Council to subvert project controls metastasized from here.

63. Met Council leadership instructed employees charged with performing cost analyses to stop ATS from putting its independent cost estimates into eBuilder until Met Council conferred with the civil contractor about the manner of work to be performed. And, at least initially, ATS complied with this demand.

64. Instead of heeding Janish's warnings and working with ATS to negotiate fair and reasonable change orders from the civil contractor, Met Council compromised the independence of ATS cost estimates.

65. By accepting the contractor's proposed method of completing work, ATS cost estimates could not identify and incorporate more efficient methods of completing the work.

66. As a result, the civil contractor could—and did—propose inefficient methods of completing change orders, the ATS cost estimate would bake in the inefficiencies, and Met Council would assume the burden to pay an unreasonable price for the work.

67. In theory, lump-sum change orders can be desirable for the government if the actual cost of the work ultimately exceeds the lump sum: the contractor assumes the

risk that it will have to eat costs in excess of the lump sum. But, here, Met Council permitted the civil contractor to reserve its rights to obtain more money and time to complete the Project based on the "cumulative effects" of change orders.

68.     Worse, ATS manager Daniel Ward, who was familiar with the means and methods proposed by the civil contractor in its change order proposals and who had been in the field to examine the work, told Janish that there was "no way" it was actually using the inefficient means and methods in its proposals.

69.     Met Council further compromised the independence of ATS cost estimates by demanding that ATS assume maximum allowable markups for the civil contractor's overhead and profit.

70.     Janish was a part of the due diligence team that determined the maximum allowable fees for overhead and profit that would be fair and reasonable for SWLRT and incorporated into the Civil Construction Contract.

71.     While the Civil Construction Contract gave the parties flexibility to negotiate fees for overhead and profit, it also provided the following maximum allowable fees for overhead and profit:

      a.  The maximum prime markup for labor was 15%.

      b.  The maximum prime markup for equipment was 0% for contractor-owned equipment and 5% for rental equipment.

      c.  The maximum prime markup for materials was 5%.

      d.  The maximum prime markup for subcontracted work was 5%.

72.     Met Council's Project Controls team, including Janish, had previously determined that maximum allowable markups represented the upper limit of what could be considered fair and reasonable on the SWLRT.

73.     For the Civil Construction Contract to be interpreted in compliance with federal law and guidance, the Contract must be read to forbid Met Council from negotiating *upward* from maximum allowable fees for the civil contractor's overhead and profit. In other words, it was only lawful for Met Council to negotiate costs with the civil contractor downward.

74.     On or around August 6, 2020, the FTA gave 30-days' notice to the United States Congress that it intended to award a Full Funding Grant Agreement to Met Council for the SWLRT.

75.     Around the same time, Met Council leadership—including Runzel, Hollick, and Alexander—agreed to pressure ATS to apply additional, across-the-board, upward adjustments to its cost estimates for change orders. The arbitrary markups violated federal law and FTA guidance.

76.     Going forward, these arbitrary markups were incorporated as formulas into an Excel workbook referred to as the "Pivot Report."

77.     Cost estimate data would be entered into the Pivot Report, which would then automatically generate higher, manipulated cost estimates based on the arbitrary markups using the Excel formulas.

78.     Met Council leadership instructed employees, including Janish, to never discuss the gap between the ATS cost estimate and the manipulated cost estimate.

19

79.     In fact, when Janish raised concerns about the legality of manipulating ATS cost estimates, Hollick told him to pretend as if the manipulated cost estimate was the "only" number.

80.     Janish was not the only person worried about Met Council breaking the law. Met Council Contract Administrators, Ed Stec and Jacquelin Willie, openly expressed concern that they could be debarred from further participation in federally funded projects as a result of using markups to artificially inflate ATS's cost estimates.

81.     Met Council leadership told them not to worry about it.

82.     Instead, Met Council directed ATS to enter its estimates into the pivot report and its employees to use the manipulated cost estimates as a starting point for comparison with contractor proposals.

83.     More specifically, the markups arbitrarily increased the ATS cost estimates in the following ways:

    a. ***Automatic 25% "change order pricing" markup.*** Met Council agreed to manipulate cost estimates by applying an automatic and arbitrary 25% markup to each line item.

        i. The 25% markup was not tied to any actual or hypothetical cost. Instead, the purported reason for the markup was the noncompetitive nature of the change order process.

        ii. This turned FTA regulations on their head: the whole point of requiring independent cost estimates and cost analyses for proposed

change orders is to *prevent* price-gouging by contractors where, as here, they are no longer required to compete with other contractors. This markup was unfair, unnecessary, unjustified, and unreasonable.

b. ***Predetermined, guaranteed 23% profit markup for labor, materials, and equipment; 15% profit markup for all subcontracting work.*** For all change orders, Met Council agreed to manipulate cost estimates by applying an automatic and arbitrary 23% profit markup for labor, materials, and equipment; and a 15% profit markup for all subcontracting work.

    i. Federal regulations require grantees like Met Council to negotiate profit as a separate element of the price for each contract in which there is no price competition and in all cases where cost analysis is performed. 2 C.F.R. §§ 200.101, 201.324(b). Profit must be fair and reasonable in each instance. 2 C.F.R. § 200.324(b); *cf.* 2 C.F.R. § 200.403(a) (requiring costs to be necessary and reasonable).

    ii. FTA guidance permits grantees like Met Council to negotiate a clause ("advanced understanding clause") in their contracts that limits the fee or profit on change orders or additional quantities to a stated maximum percent of estimated costs. FTA Circular 4220.1F.

    iii. This advanced understanding clause is *negotiable downward only* from the maximum allowable markup, depending on the complexity of the change, the risk involved, amount of subcontracting, etc. *Id.*

21

iv. Further, FTA guidance states that this profit limit should *not* be stated as a predetermined, guaranteed profit percentage on change order work because the changed work may not warrant the percentage in question and such an agreement could be construed as a cost-plus-percent-of-cost agreement, which is prohibited per FTA Circular 4220.1F. *See also* 2 C.F.R. § 200.324(d).

v. Thus, in violation of federal regulation FTA guidance, and its contractual requirements, Met Council agreed to (a) negotiate *upward* and arrive at a fee for overhead and profit on change orders in excess of maximum allowable markups under the Civil Construction Contract; and to (b) provide an additional predetermined, guaranteed profit percentage on change order work regardless of whether the work warranted the percentage in question. These markups were unfair, unnecessary, unjustified, and unreasonable.

c. ***Up to 40% markup–and a default 23% markup–for alleged "train delays," or idle time to allow passage for trains.*** Met Council agreed to manipulate cost estimates by applying an automatic 23% to 40% markup on the total cost of lump-sum change orders for imaginary train delays.

i. The Pivot Report applied a default 23% markup for train delays. This markup was purported to cover costs associated with workers standing idle to make way for passing freight trains.

22

    ii.  But the assumption that the contemplated work would result in any train delays, much less delays of such magnitude warranting a 23% to 40% markup, was unfair, unjustified, and unreasonable.

    iii.  For example, markups were applied to changed orders in locations where *no trains* were running because *no freight rail* existed.

    iv.  Further, as discussed below, Met Council agreed to an unfair, unreasonable, and unjustified 40% markup for train delays for the construction of a crash barrier for Change Orders 90 and 591. This markup was unfair, unnecessary, unjustified, and unreasonable.

d.  ***Automatic 8% markup for a Disadvantaged Business Enterprise (DBE) premium.*** Met Council agreed to manipulate cost estimates by applying an automatic 8% markup for purported estimated costs associated with hiring DBE contractors.

    i.  But the markup was applied without any showing that the DBEs were actually hired to perform the work, much less at a higher cost than non-DBEs.

    ii.  Janish's review of change order proposals revealed that the civil contractor had not identified any DBEs involved in the work or, if DBEs were identified, the amount of the markup exceeded the estimated costs of the DBE work.

    iii.  Met Council maintained no records and performed no cost analyses to determine whether anticipated DBE costs were accurate or

23

actually–and reasonably–being incurred. This markup was unfair, unnecessary, unjustified, and unreasonable.

e. ***Automatic markup for all electrical work.*** Met Council agreed to manipulate cost estimates by falsely pretending that *all* electrical work on SWLRT change orders would be the most difficult—and, thus, the most expensive—as rated by the National Electrical Contractors Association. This markup was unfair, unnecessary, unjustified, and unreasonable.

84.    At all relevant times, Met Council was obligated to comply with federal laws, regulations, and guidance, including the obligation to ensure the price it was paying for work on the SWLRT was fair, necessary, and reasonable. *See* 2 C.F.R. § 200.403.

85.    Pursuant to federal regulations, a cost is fair and reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost.

86.    The markups referenced and described herein were facially unfair and unreasonable. And Met Council never justified them in accordance with required cost analyses.

87.    By August 2020, members of Met Council's Project Controls team, including Janish, were expressing despair and disbelief amongst themselves that the application for a Full Funding Grant Agreement was sitting before the United States Congress while grossly misrepresenting the SWLRT's costs and schedule for completion.

88.    Yet, on September 14, 2020, the FTA formally approved Met Council's Full Funding Grant Agreement.

24

89.    The next day, Janish contacted the government to report his concerns about Met Council's violations of federal laws and regulations on the SWLRT.

90.    At the government's request, between September 2020 and May 2021, Janish corresponded regarding his concerns, sent supporting documents, and sat for interviews.

91.    After first going along with Met Council's instruction to manipulate its cost estimates, ATS soon disavowed the manipulated cost estimates as their own and proposed adding disclaimers to the estimates.

92.    ATS also sought Met Council's assurance that it would not sue ATS—and would indemnify and hold ATS harmless against all legal action—based on the manipulated cost estimates.

93.    Indeed, or around July 1, 2021, ATS wrote to Met Council that "that Met Council is being significantly overcharged by … for contract changes, in both cost and schedule"; confirmed that ATS had been preparing manipulated cost estimates "using rates, prices, factors, and assumptions" at the instruction of Met Council; and reiterated its request for indemnification.

94.    Incredibly, even though ATS disavowed the cost estimates as their own, Met Council continued to falsely identify the manipulated cost estimates as ATS *independent* cost estimates in its cost analyses.

95.    Change Orders 90 and 591 for the extension of a crash protection barrier between the Glenwood Avenue bridge and the Bryn Mawr station illustrate Met Council's violations of its legal obligations.

25

96.    Change Order 90 centered around earthwork for the crash protection barrier; Change Order 591 was to cover the remainder of the scope of work for the crash protection barrier.

97.    After employing the maximum allowable markups under the Civil Construction Contract, ATS arrived at a cost estimate of about $23 million for Change Orders 90 and 591.

98.    After running ATS's cost estimate through the Pivot Report, the manipulated ATS cost estimate ballooned to about $35 million. But the civil contractor estimated that the work associated with Change Orders 90 and 591 would cost upwards of $100 million.

99.    Given the remaining chasm between the manipulated ATS cost estimate and contractor's proposal, Met Council went back to ATS, requesting that it increase its estimate even more. ATS refused.

100.   On or around March 12, 2021, Met Council ignored its obligations under the law and agreed to pay approximately $92.5 million for work associated with Change Order 90 and 591.

101.   After the fact, in a bad-faith effort to satisfy its obligations under the Full Funding Agreement, Met Council drafted a "Summary of Negotiations" ("Summary") relating to these change orders.

102.   The Summary contained several misrepresentations.

103.   For example, the Summary claimed that ATS initially estimated the cost of the change orders at $35,113,389 in June 2020. But, again, ATS estimated the cost of the

work to be no more than $22-25 million, and the $35 million figure reflected a cost estimate manipulated by the arbitrary markups.

104.    The Summary also claimed that ATS submitted a revised cost estimate of the change orders in January 2021 for $36.6 million, but, again, ATS estimated the cost of the work to be no more than about $25-28 million. The $36.6 million figure reflected a cost estimate manipulated by the arbitrary markups.

105.    The Summary also accused ATS of not considering site-specific complexities in developing its cost estimate. But ATS performed a project-wide constructability analysis and led discussions during constructability review meetings with the FTA.

106.    In fact, site-specific constraints were a  major topic of the FTA's constructability review. Further, ATS had direct and unfettered access to the Engineers of Record in developing its cost estimate. In addition, as required by its professional standard of care, ATS estimates were calculated by a licensed engineer and subjected to peer review by the engineer's supervisor (i.e., another licensed engineer).

107.    On information and belief, ATS fully considered site constraints in its cost estimates.

108.    Further, without saying as much, the Summary makes clear that no true cost analysis was done to justify its conclusions. For example, the Summary attributes $45 million of the costs for Change Orders 90 and 591 to labor costs.

109.    These proposed labor costs alone dwarfed the total ATS estimate by more than $20 million. But the Summary provides no rationale, much less an analysis, for the

likely labor costs on Change Orders 90 and 591. The theoretical basis for estimated train delays was that the contractor would need to stop work that could foul the track when a train is passing through the area.

110.    Janish knows the estimated train delays were fabricated.

111.    When he worked for Atlas Construction on Target Field, he was the project manager for piling along the same stretch of track involved in Change Orders 90 and 591.

112.    Atlas Construction is the same company drilling caissons for Change Orders 90 and 591. This earlier piling work for the Target Field project had a higher potential to foul track than the construction of the SWLRT crash barrier. Yet, Atlas Construction was able to adapt.

113.    As a result, using value engineering principles on the Target Field project, train delays were minimal (i.e., between 0% and 10% of the time depending on the nature of the work).

114.    Considering only Change Orders 90 and 591, the estimate of costs associated with train delays were artificially inflated by upwards of 30%.

115.    In an effort to paper over the fact that Met Council was paying too much, Met Council circumvented ATS by hiring another consultant, Atkins North America, Inc. d/b/a Faithful+Gould ("F&G"), to bless Change Orders 90 and 591.

116.    On information and belief, Met Council had a practice of hiring third-party consultants like F&G as "ringers" to conceal that Met Council was disregarding its project controls and paying too much  on the SWLRT.

28

117. Janish has working drafts of a memorandum purporting to be from F&G Senior Project Manager David Galetka to Brian Runzel regarding Change Orders 90 and 591.

118. The F&G Memorandum is dated March 18, 2021—i.e., several days *after* Met Council had already agreed to pay an unfair and unreasonable amount for the change order work.

119. Indeed, a review of the document's editing history reveals that (1) Met Council leadership was heavily involved in drafting the Memorandum; (2) F&G did not engage in a cost analysis of the change orders (as ATS had done); and (3) served as nothing more than a *post hoc* rubber stamp on Met Council's prior decision to pay an unfair and unreasonable amount for the change order work.

120. For example, in an early draft of the F&G Memorandum, Met Council Director of Construction Runzel deleted language suggesting that F&G could not justifiably bless the proposal without further investigating the variance between the (manipulated) ATS estimate and the civil contractor's proposal. *See* Figure 1 below.

**Figure 1**

- There are some significant pricing variances for scope between the LMJV and the ICE including: ¶
  - e.g. forming and stripping costs in the retaining wall scope; LMJV's cost is approximately $103/SF vs $25/SF in the ICE. These will need further investigation to understand pricing industry comparable.¶
  - Mobilization – It has been verified that the equipment needed for this change order will be additional ed equipment and not the equipment from existing or the base scope of work. ¶
  - Retaining wall – there is a major difference in cost for this scope of work so F+G will carry out a review of the unit costs and productivity factors to compare with industry standard for this type of work in this area and under these conditions.¶
  - Other Major Sub Work – Need to further investigate the sub quotes to ensure that they are accurate and not included or duplicated in other scope sections.¶
  - All Other Direct Costs – There are temporary construction activities that are included by the contractor but not included in the ICE. These need further analysis.¶
  - Mark-up is included at the agreed 23% to cover overhead and profit (OH&P). Through negotiations with the LMJV, General sSuperintendents were removed, and pickup trucks are being charged as direct cost items. The issue of 23% mark-up has been clarified to better understand what is included in this fee.¶

121. F&G dutifully accepted Runzel's deletion.[3]

122. Further illustrating the farce of its Memorandum, F&G noted the existence of facially arbitrary markups and then treated them as if they were facially reasonable.

123. Similarly, when F&G suggested that the civil contractor was overestimating its costs given market conditions, Runzel deleted the language. *See* Figure 2 below.

**Figure 2**

performing this work it became clear that most of the contractor pricing is reasonable for the situation in which this work is to be performed. We have also found that there are areas in the LMJV proposed cost of the work that seemed to be higher than we would anticipate for the current market conditions.

124. And, again, F&G dutifully accepted the deletion. *See* Figure 3 below.

---

[3] During the course of the Minnesota Legislative Auditor's special review of the Project, the Legislative Auditor requested one or more of the foregoing drafts of the F&G Memorandum. Met Council concealed and failed to produce the drafts.

**Figure 3**



RB  Runzel, Brian
I called David and he is ok
removing this sentence.
3/25/21 4:58 PM

125.   Of course, Change Orders 90 and 591 are just the tip of the iceberg. As of April 29, 2022, Met Council had agreed to increase the costs of the SWLRT by hundreds of millions of dollars by approving 622 change orders for its civil contractor.

126.   In addition, Janish discovered and attempted to investigate potential improper payments to the civil contractor on pay applications.

127.   For example, Janish found that the Project's schedule of values diverted millions of dollars intended for specific work and materials toward an unspecified "general conditions" line item.

128.   Between Pay App 10 and Pay App 22, a line item appeared for "general conditions" relating to one of its electrical subcontractors.

129.   More specifically, the line item reassigned more than $3.3 million of funds intended for specific electrical work to a subcontractor's "general conditions" line item and sought payment against this general line item before any work had been performed.

130.   Janish also discovered that Council Authorized Representatives (CARs) and their assistants were systematically failing to properly review the civil contractor's pay applications and (apparently) unaware of problems with the Schedule of Values.

31

131.    In or around July 2020, when Janish reported his findings to Hollick, she summarily directed him (and others) to approve the pay applications.

132.    On another occasion, Janish discovered that the civil contractor seemed to be billing and receiving payment for hours of labor that had not actually been worked under a time-and-materials agreements with Met Council.

133.    For example, on Change Order 669, the hours of work claimed in the pay application greatly exceeded the amount of hours worked in laborers' certified time records.

134.    When Janish spot-checked another time-and-materials change order and discovered the same violation, he again reported the problem to Hollick. And, again, she thwarted his efforts.

135.    Rather than investigate and dispute the costs, Met Council agreed to convert the time-and-materials change order(s) into a larger lump-sum change order after the work had already been completed at a lower cost. Met Council disregarded its obligations to ensure costs were fair and reasonable and, as a result, paid too much for the change order work on the SWLRT.

136.    Under the terms of the Civil Construction Contract, Met Council was entitled to liquidated damages for things such as schedule delays. *See* Civil Construction Contract at § 11.7.

137.    At one point, Janish informed Met Council that it would be entitled to about $130 million in liquidated damages from the civil contractor for its failure to reach critical SWLRT milestones.

32

138.   Yet, again, Met Council declined to assess *any* liquidated damages, or otherwise enforce the Civil Construction Contract against its civil contractor.

139.   Instead, on or around March 17, 2022, Met Council entered into a settlement agreement with the civil contractor that extended the deadline to complete work until September 2025 and promised to pay an additional $40 to $210 million.

**Met Council Retaliates against Janish for Reporting, Opposing, and Refusing to Participate in Suspected Illegal Activity.**

140.   Throughout much of his time as Project Controls Manager on the SWLRT, Janish made internal reports of unlawful activity. And, as described above, when his concerns fell on deaf ears, Janish reported his concerns about the Project to law enforcement.

141.   Further, between September 2020 and May 2021, at the government's request, Janish corresponded, provided documents, and sat for interviews with the government.

142.   On or around May 24, 2021, ATS sent a letter to Met Council leadership raising grave concerns about the use of "contractor-negotiated" pricing—that is, the arbitrary markups.

143.   On or around May 27, 2021, ATS sent another letter to Met Council asking it to indemnify and hold ATS harmless against legal actions or claims arising from the use of the arbitrary markups.

144.   On or around July 1, 2021, ATS sent another letter to Met Council.

33

145.    In the letter, ATS stated "that Met Council is being significantly overcharged by [its civil contractor] for contract changes, in both cost and schedule"; confirmed that ATS had been preparing manipulated cost estimates "using rates, prices, factors, and assumptions" at the instruction of Met Council; and reiterated its request for indemnification.

146.    On or around July 20, 2021, Janish attended a meeting with Met Council leadership where a representative from the FTA disclosed that the Office of the Inspector General (OIG) was "sniffing around."

147.    A week later, on or around July 29, 2021, Minnesota State Senator Scott Dibble and State Representative Frank Horstein sent a letter to the Legislative Auditor asking for an expedited review of the SWLRT's costs, overruns, delays, and apparent mismanagement.

148.    Shortly thereafter, in or around August 2021, Hollick assigned extra job duties to Janish, which included reviewing SWLRT change orders and writing cost analyses about whether proposed change orders were fair, necessary, and reasonable as required by federal law.

149.    The new duties were not part of Janish's job description and were typically performed by employees at lower levels of Met Council, including people Janish supervised.

150.    As described above, while reviewing change orders and doing cost analyses, Janish reviewed Met Council's Pivot Reports and observed that they appeared to contain two totals: one, a cost estimate that assumed maximum allowable markups

34

allowable under the Civil Construction Contract; the second, the same cost estimate augmented and manipulated by arbitrary markups.

151.   When Janish spoke to ATS Lead Estimator Dan Ward about these two numbers, Ward said that the lower number was, in fact, ATS's cost estimate and that the second number was an estimate created by Met Council construction staff's "offline manipulation."

152.   On or around September 8, 2021, Hollick gave Janish a "Performance Expectations Memo."

153.   On or around October 2, 2021, Met Council informed Janish that he was under "investigation" for failure to "finish" a change order, that is, by approving it as fair and reasonable.

154.   On or around October 4, 2021, Janish attended an investigatory meeting with HR, Hollick, and a union representative. At the meeting, HR gave Janish a *Tennessen* warning and said he was not meeting expectations.

155.   Following the warning, Hollick took over the meeting and began interrogating Janish with a series of condescending and demeaning questions. For example:

   a.   Do you believe I have the authority to assign you work?

   b.   Do you believe change orders fall under the umbrella of Project Controls?

   c.   Do you understand the change order process?

   d.   Was I clear in my request to have you complete the change orders?

35

156.   On or around October 8, 2021, Janish went on approved FMLA to care for his mother.

157.   On or around October 26, 2021, Janish met with Hollick. She gave him a verbal warning backdated to October 11, 2021 for allegedly not approving Change Order 679.

158.   Later that day, Hollick emailed Janish to reprimand him for claiming to complete Change Order 679. Hollick told Janish it was not "complete" because he had not approved it.

159.   On or around October 28, 2021, the Legislative Auditor released a memo in response to the Dibble-Hornstein letter. Met Council feigned ignorance and publicly defended itself—concealing the fact that Janish (among others) had been raising grave concerns about the SWLRT for months (if not years).

160.   On or around November 1, 2021, Met Council informed Janish that it was investigating him–again–for allegedly not completing his review of a civil contractor change order.

161.   That same day, Janish sent a detailed summary of his concerns about unlawful activity to Hollick, Alexander, and Met Council Regional Administrator Mary Bogie.

162.   On November 2, 2021, Janish attended a meeting regarding Met Council's second investigation. In the meeting, Hollick chastised Janish for not approving the change order.

36

163.   Janish reiterated that he could not approve the change order because it was not fair and reasonable, and, therefore, approving it would be illegal. He further explained why applying the arbitrary markups to ATS cost estimates was illegal.

164.   In response, Hollick claimed that the factors had been "vetted" and demanded that Janish "get the change orders to be fair and reasonable."

165.   Hollick then demanded that Janish ignore the ATS cost estimates in the Pivot Reports that had not been artificially inflated by the civil contractor's markups, saying:

**"We don't talk two numbers …." She said, "There is only one."**

166.   On November 10, 2021, Met Council's Deputy General Manager of Capital Programs, Nick Thompson, informed Janish that he was done reviewing change orders; that he was receiving a temporary reassignment; that he would no longer be reporting to Hollick; and that Met Council had made these decisions because of the concerns he had raised about the SWLRT.

167.   Although Met Council was on track to terminate Janish, they changed course after his report of retaliation, and, instead, decided to adopt a strategy designed to get him to quit.

168.   It soon became evident to Janish that his reassignment was a material demotion. On or around December 7, 2021, Alexander told him to cancel all of his meetings with the SWLRT's Project Controls team.

169.   At or around this time, Hollick and others involved with the SWLRT began hiding their Outlook calendars from Janish and formally uninviting him from meetings.

37

And Met Council leadership warned Janish's SWLRT coworkers not to talk to him under any circumstances.

170.    Met Council simultaneously stripped Janish of his duties as Project Controls Manager on the SWLRT, including his supervisory responsibilities.

171.    Over the course of the next month, Met Council effectively pushed Janish out of his role on the SWLRT and reduced his job duties to menial tasks like archiving emails and data entry. Worse, Met Council humiliated Janish by directing him to provide progress reports on his menial work to a former subordinate.

172.    On or around January 12, 2022, Janish learned that this allegedly temporary reassignment and material demotion was in fact permanent. Thompson told Janish that he could not return to the Project office and that Met Council planned to reassign him out of its Capital Investment Grants program entirely.

173.    Thompson stated that Met Council wanted him to move to a non-managerial position in Met Council's engineering and facilities department where he would perform site inspections on a project not involving light rail: the construction of a bus depot.

174.    On January 19, 2022, Janish spoke with Met Council Assistant Director of Engineering and Construction Jim Harwood about the potential transfer to the engineering and facilities department. Harwood told Janish that the transfer would not be a good fit for him.

175.   On February 17, 2022, Janish had a videoconference with Thompson and Harwood. During the meeting, Thompson shared a description of the contemplated position.

176.   The job description indicated it was a non-union position, meaning that Janish would no longer be a part of his union, the Transit Manager-Supervisor Association.

177.   Janish told Thompson and Harwood that he had no interest in the position. Thompson responded that if Janish did not accept the transfer, Met Council would have to continue investigating him. But Janish remained steadfast.

178.   Then, on February 25, 2022, Janish received an invitation to meet with Met Council HR Manager Rebecca Grams.

179.   Grams said that the purpose of the meeting was to determine how to "move forward."

180.   Grams wanted to know what concerns he had about reassignment to a bus depot.

181.   Janish explained his concern that it was a non-union position; that it would double his commute; that it was a significant demotion; and, again, that it would derail his career in light-rail.

182.   Grams stated that she would get back to him. But she never did.

183.   Over the next several weeks, Janish woke up everyday expecting to be fired.

184. Then, in early April 2022, Alexis Baker, another HR representative, set up a meeting with Janish.

185. At the meeting, Baker explained that the purpose of the meeting was limited to determining if Met Council had ever violated its Respectful Workplace policy against Janish.

186. Strangely, Janish had never alleged a violation of Met Council's Respectful Workplace policy per se.

187. So, during the meeting, Janish clarified that he had opposed being retaliated against in response to his reports of unlawful activity on the SWLRT and his refusal to participate in it.

188. Incredibly, Baker claimed to have no prior knowledge of these allegations, stating that there was no record of any investigation or alleged retaliation in his file.

189. She further stated that the only thing in his file were his annual reviews, which looked good. And she made clear that she did not have any authority to investigate Janish's allegations beyond the Respectful Workplace Policy.

190. In this regard, Baker's primary focus was on whether anyone at Met Council had ever physically threatened Janish. She had no apparent interest in determining whether Janish had been retaliated against in some other way.

191. On or around April 8, 2022, Baker informed Janish that no one had violated Met Council's Respectful Workplace Policy.

192. On or around Monday, April 11, 2022, Janish emailed Thompson and asked about the uncertainty surrounding his role at Met Council. Around this time, Met Council

was modifying its COVID-19 remote work policy and welcoming employees back to the office. And employees on the SWLRT were talking about celebrating that week with an office party.

193.   On or around April 12, 2022, Thompson told Janish to just stay home and not come to the office.

194.   On or around April 22, 2022, Baker again reached out to Janish to schedule a videoconference.

195.   Baker reconfirmed that she had completed her investigation; that Met Council would be taking appropriate actions; that she could not disclose what those actions were; and that he should expect to hear from Thompson and Robin Caufman, Met Council's Director of Capital Programs Administration.

196.   On or around April 27, 2022, Janish met in person with Caufman and Nick Landwer, Met Council's Director of Transit System Design and Engineering.

197.   Caufman explained that there was an opportunity on the Blue Line Extension - Bottineau Light Rail Transit Project; that Met Council could use Janish's expertise on the project; and that it planned to move him there.

198.   Janish responded that he would need to learn more about the position and speak to his family before making a decision. Later that evening, before Janish had an opportunity to fully consider the offer, Thompson emailed Janish with an attached "confirmation of transfer."

199.   The next morning, on April 28, 2022, Landwer invited Janish to a 30-minute meeting entitled "BLRT Coordination." Janish told Landwer that he was still

41

discussing things with HR and asked if he could table the meeting. Landwer said no problem. Around 9:45 that morning, Met Council IT removed Janish's access to all folders relating to the SWLRT.

200.    On April 28, 2022, Janish forwarded Thompson's email to Baker and Marcy Syman, Human Resources Director.

201.    Confused by the transfer, Janish inquired into whether the transfer was voluntary or involuntary; whether he would receive any documentation from HR regarding the job or transfer (e.g., a written offer, position description, position title, rate, class, job duties, and the like); and whether he would receive his 2021 performance review.

202.    Janish also expressed concern regarding the loosely described duties, the lack of an organizational chart with his position in it, and whether he was being set up to fail.

203.    On April 29, 2022, Syman emailed Janish, clarifying that the transfer decision had been made and that he did not have a choice in the matter:

> It's only doing the same work on a different project under the direction of a different manager. Your expertise is needed on the Blue Line and will provide you with a different work environment. Management has the right to assign employees to different projects as long as it's the same job description. This move should not be construed as disciplinary action and results in no change to your employment status.
>
> Since your review is very late and your project assignment is changing to a new manager, it didn't make sense to go through the motions of completing a performance review with your former manager. We have given you a performance-based increased [sic].

204.    Syman's statement that Janish's new position would entail the "same work" was false.

205.    On or around May 2, 2022, Janish arrived at his office to find that it had been rummaged through: with documents he had collected and annotated regarding his concerns about the SWLRT strewn across his desk and floor, and with significant pages removed from handwritten daily log notebooks.

206.    Soon thereafter, Landwer informed Janish that the office was no longer his and that he would now be working in a shared cubicle on the opposite side of the building.

207.    Janish had been in the office since 2015.

208.    On or around May 3, 2022, Landwer told Janish that he needed to remove personal belongings from his former office.

209.    At the time, Landwer did not believe it was urgent. But the next day, Landwer told Janish that Caufman had been repeatedly texting him to demand that Janish clean out his office *as soon as possible*. Landwer told Janish that he did not know what the rush was about.

210.    On or around May 5, 2022, Janish removed his personal belongings from his office. A few days later, when Janish came to the office, he discovered that the SWLRT documents had been unclipped, removed from the office, and apparently destroyed.

211.    In the months that followed, Met Council advertised for and hired a new Project Controls Manager on the SWLRT.

212.   Thus far, Janish's fear that his "new" position would not be comparable to his old position has been borne out.

213.   For example, on the SWLRT, Janish managed a department with numerous staff at the center of project activity covering scope, schedule, budget, and compliance; he had decision-making authority and was a point person for discussions with FTA; he had access to all (or nearly all) information relating to the project; and his days were filled with meetings and contact with colleagues.

214.   In early October 2022, Janish was given his first person to "supervise" on the Blue Line Extension: a part-time college intern. During his time as Project Controls Manager for the SWLRT, Janish had directed and supervised a team of about ten experienced Project Controls staff and consultants.

215.   Conversely, on the BLRT, Janish is not responsible for managing a department with numerous staff at the center of the project's activity. He does not have decision-making authority and is shut out of discussions with FTA; he is locked out of certain project folders on Met Council's SharePoint site; and his days are empty of meetings and contact with colleagues. In short, Janish is not the Project Controls Manager on the BLRT.

216.   In 2023, Met Council created and filled a new position between Janish and his supervisor Landwer: effectively demoting Janish in the Met Council's organizational structure.

217.   Before filling the position, Met Council did not notify Janish of the new position, encourage him to apply, or explain the rationale for creating the position. Met

44

Council's failure to communicate in advance with Janish about these personnel changes in his direct line of reporting is a departure from Met Council's customary practice.

218. By investigating, threatening, ostracizing, and demoting Janish, Met Council has tarnished his professional reputation, destroyed his professional relationships, caused him great distress, and significantly derailed his career.

219. As a result, Plaintiff has suffered (or may suffer) economic losses (including lost wages and/or benefits), emotional distress, mental anguish, humiliation, embarrassment, harm to dignity, loss of reputation, lost earning capacity, and other injuries.

**Janish Is Not Alone: Met Council Has Pushed Out Others Who Reported Concerns about the SWLRT.**

220. Janish is aware of multiple Met Council employees and consultants who raised concerns similar to his and who likewise had their concerns minimized, dismissed, suppressed, or concealed.

a. *Change Control Engineer T.W. quits because he cannot in good conscience approve grossly inflated change orders.*

    i. T.W. repeatedly complained to Hollick that the change order pricing and cost data was grossly inflated and that Met Council was paying too much for change order work.

    ii. T.W. was responsible for approving change orders after construction staff had fallen behind. And he ultimately quit because he could not in good

conscience continue to sign off on change orders when they were not fair and reasonable.

iii.   After T.W.'s benefits vested, he went back to the private sector.

iv.   In his exit interview, T.W. warned Hollick that Met Council was at risk of losing the entire federal grant award if anyone looked into the project.

b.   *Met Council Procurement Department employee M.S. witnesses a culture of secrecy and reprisal.*

    i.   M.S. was responsible for reviewing SWLRT change orders that were over $1 million. At all relevant times, M.S. reported to Laura Vetter, who in turn reported to Jody Jacoby, Met Council's Director of Contracts & Procurement.

    ii.   In department meetings with staff, Jacoby told employees that they were not to text each other regarding their work on the SWLRT, in case their personal cell phones ever became the subject of discovery in a future lawsuit.

    iii.   Jacoby further directed employees not to email her about any criticisms or questions about the SWLRT and that they should only deliver her hard copies of documents.

    iv.   During her reviews of change orders in excess of $1 million, M.S. identified duplicate markups and excessive markups that the construction staff had approved without a substantive cost analysis.

46

v.    As stated above, M.S. personally attended change order negotiations involving Met Council, its civil contractor, and a parent company, and reported that the meetings "felt rehearsed."

vi.    M.S., like Janish, was accused of being "*insubordinate*" for holding up change orders because of deficient cost analyses.

vii.    Met Council later directed M.S. to change her review process so that she could only determine that a cost analysis was physically present without reviewing its substance. Specifically, Met Council directed M.S. to confirm there was a document purporting to include a cost analysis. She was ordered to approve the change order without scrutinizing the substance of the "cost analysis" as required by federal law and regulations.

viii.    In short, Met Council leadership instructed M.S. to rubber-stamp change orders in excess of $1 million that came across her desk. She quit as a result.

c. *Subcontractor Kimley Horn suppresses concerns about unfair and unreasonable costs for change orders.*

i.    J.P. worked under the Construction Management Support Services contract held by subcontractor Kimley Horn. At all relevant times, J.P. reported to Kimley Horn's Construction Manager and Vice President Steve Pfllipsen.

ii.    Kimley Horn roped in J.P. to write some of the cost analyses on behalf of Met Council. J.P. told Janish that he had the same concerns Janish had

about unfair and unreasonable costs and that he had shared those concerns with Pflipsen.

iii.   J.P. and Pflipsen had discussed how to proceed and arrived at a solution for J.P.'s conscience: if he came across a cost that he believed was not fair and reasonable, he would mark it as "not reviewed."

iv.   On information and belief, the change order would then be passed along to someone else who would mark the item as fully reviewed so that the change order could be approved.

d.  *Met Council suppresses Senior Internal Auditor A.A.'s investigation into unlawful activity.*

i.   A.A. reported to Matt LaTour, Met Council's Director of Program Evaluation and Audits, regarding contracts with third-party appraisers hired to estimate the value of property being acquired for the SWLRT.

ii.   Under the terms of the contracts, appraisers agreed to bill on an hourly basis, but capped the bill for each appraisal at a not-to-exceed dollar value.

iii.   In or around 2018, while reviewing invoices from right-of-way appraisal companies, Janish discovered that an appraisal company had billed for the not-to-exceed value when the actual value of its hours worked was less.

iv.   Janish rejected the invoice and directed the appraisal company to revise the invoice and bill for only the hours actually worked.

v.   Hollick intervened: allowing the appraisal company to bill for the full amount of the not-to-exceed value.

48

vi.     When Janish explained that Met Council would then have to claw the money back due to the overpayment, Hollick became visibly angry, sharpened her tone, and snapped that she would wait for the audit department to tell her to do it.

vii.     Later, during a routine audit of the SWLRT right-of-way acquisition process, Janish conveyed his concerns about appraisal companies on the SWLRT to A.A.

viii.     During her audit, A.A. discovered that appraisal companies were submitting wildly inflated not-to-exceed estimates based on an hourly rate and then billing the full amount of the estimate in excess of the hours actually worked.

ix.     Incredibly, A.A. found an email chain in which MNDOT staff encouraged an appraiser to bill for the full not-to-exceed value because Met Council would pay it.

x.     When LaTour learned about A.A.'s findings, he terminated the audit and told A.A. to stop drafting her final report. In its place, LaTour instructed A.A. to work with Caufman on a (whitewashed) PowerPoint presentation for the Met Council Audit Committee. The PowerPoint omitted any mention of wrongdoing on the SWLRT.

xi.     Nonetheless, in his communications with A.A., LaTour acknowledged that the way Met Council was doing cost analyses and cost estimates was improper.

xii.   Following the suppression of her audit, A.A. left the SWLRT and ultimately chose to leave Met Council.

## CAUSES OF ACTION

### COUNT ONE
*Retaliation in Violation of*
*Minn. Stat. § 181.931 et seq.*
(Against Met Council)

221.   Minnesota Statutes Section 181.931 *et seq.*, informally known as the Minnesota Whistleblower Act, prohibits employers from discharging, disciplining, threatening, or otherwise discriminating against or penalizing an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee:

a.   Reports a violation, suspected violation, or planned violation of law or rule adopted pursuant to law;

b.   Is asked by a public body or office to participate in an investigation, hearing, inquiry; or

c.   Refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates the law and says as much to his employer.

222.   As alleged herein, Janish engaged in protected activity by:

a.   Reporting, in good faith, violations, suspected violations, or planned violations of law and regulation;

50

b. Being asked by a public body or office to participate in an investigation, hearing, or inquiry; and

c. Refusing Met Council's order(s) to perform an action(s) because he had an objective basis in fact to believe the action(s) violated the law and said as much to Met Council.

223. As alleged herein, Defendant Met Council took adverse employment action against Janish because of his protected conduct and in anticipation of additional protected conduct.

224. In taking adverse employment action against Janish, Met Council acted with deliberate disregard for the rights and/or safety of Janish and others.

## COUNT TWO
*Retaliation in Violation of*
*Article I, Section 3 of the Minnesota Constitution*
(Against Met Council and Joan Hollick in Her Individual Capacity)

225. Defendant Met Council is a public employer.

226. As an employee of Met Council, Plaintiff had a right to speak as a citizen on matters of public concern without fear of retaliation by his public employer under Article I, Section 3 of the Minnesota Constitution.

227. As alleged herein, Plaintiff exercised his right to speak as a citizen on matters of public concern relating to the SWLRT.

228. As alleged herein, Defendants retaliated against Plaintiff by taking adverse employment action against him because of his speech on matters of public concern relating to the SWLRT.

51

229.   In taking adverse employment action against Plaintiff, public officials at Met Council, including Hollick, acted under color of state law and deprived Plaintiff of his right to free speech under the Minnesota Constitution.

230.   In taking adverse employment action against Janish, Met Council acted with deliberate disregard for the rights and/or safety of Janish and others.

### COUNT THREE
*Retaliation in Violation of*
*the First Amendment to the U.S. Constitution and 42 U.S.C. § 1983*
(Against Met Council and Hollick in Her Individual Capacity)

231.   Defendant Met Council is a public employer.

232.   As an employee of Met Council, Plaintiff had a right to speak as a citizen on matters of public concern without fear of retaliation by his public employer under the First Amendment to the U.S. Constitution.

233.   As alleged herein, Plaintiff exercised his First Amendment right to speak as a citizen on matters of public concern relating to the SWLRT.

234.   As alleged herein, Defendants retaliated against Plaintiff by taking adverse employment action against him because of his speech matters of public concern relating to the SWLRT.

235.   In taking adverse employment action against Plaintiff, public officials at Met Council, including Hollick, acted under color of state law and deprived Plaintiff of his right to free speech under the U.S. Constitution and 42 U.S.C. § 1983.

236.   As alleged herein, Defendants acted with malice or reckless indifference to Plaintiff's federal rights.

## **REQUEST FOR RELIEF**

Therefore, Plaintiff requests the Court to enter an Order for Judgment in favor of himself and against Defendants:

A. Declaring Defendants' conduct and practices to be in violation of Plaintiff's rights under state and federal law, and ordering them to stop their unlawful conduct and practices;

B. Granting appropriate injunctive relief, including Plaintiff's reinstatement or an equitable alternative;

C. Awarding damages to Plaintiff in a substantial amount in excess of $50,000 to be determined at trial for:

   a. Any loss of past and future income and benefits; and

   b. Emotional distress, mental anguish, humiliation, embarrassment, loss of reputation, lost earning capacity, and other injuries.

D. Awarding liquidated damages to Plaintiff as required or permitted by law;

E. Awarding treble damages to Plaintiff as required or permitted by law;

F. Awarding punitive damages to Plaintiff as required or permitted by law;

G. Imposing other statutory damages or penalties on Defendants and awarding them to Plaintiff as required or permitted by law;

H. Awarding reasonable attorneys' fees, costs, and disbursements to Plaintiff as required or permitted by law;

I.  Awarding pre- and post-judgment interest to Plaintiff as required or permitted by law; and

J.  Ordering any such other relief as the Court deems proper, equitable, and just.

### JURY TRIAL DEMANDED

Janish hereby demands a trial by jury.

**PREMO FRANK PLLC**

Dated: November 9, 2023

_s/Stephen M. Premo_
Matthew Alan Frank (MN# 0395362)
    matt@premofrank.com
Stephen M. Premo (MN# 0393346)
    stephen@premofrank.com
300 Union Plaza
333 Washington Avenue North
Minneapolis, MN 55401
Tel: 612-445-7049

*Attorneys for Plaintiff*

54

## ACKNOWLEDGEMENT

I certify that this pleading, written motion, or paper complies with Subdivision 2 of Minnesota Statutes Section 549.211, and I acknowledge that sanctions may be imposed if it does not.

Date: November 9, 2023

*s/Stephen M. Premo*
Stephen M. Premo (MN #0393346)